PEDEN IRON & STEEL CO. et al. v. CLAFLIN et. al.

No. 11066.

Court of Civil Appeals of Texas. Galveston.

Dec. 5, 1940.

Rehearing Denied Jan. 30, 1941.

Baker, Botts, Andrews & Wharton and Albert P. Jones, all of Houston, for appellants.

Allen, Helm & Jacobs, S. M. Helm, and Arthur P. Terrell, all of Houston, for appellees.

GRAVES, Justice.

This appeal is from a $20,000 judgment in the appellees' favor against appellants, entered both upon a jury's verdict in response to special issues submitted and upon independent findings of the court itself from the evidence, by the 80th District Court of Harris County, as for damages for personal injuries resulting to the appellee, Mrs. Claflin, from the negligence of the appellants in a collision between one of the appellants' trucks and Mrs. Claflin on the Air Line Road in Harris County, near its intersection with the Westfield Road, on November 10, 1938.

The truck, to which a trailer was attached, while belonging to the Steel Company, was being driven at the time by appellant, J. J. Wright, and the injured appellee was on foot on the ground.

This summary of the jury's findings, in response to 46 special issues, is taken from the appellants' brief:

"(1) That just prior to the accident, Wright was operating his truck at a speed which was dangerous under the circumstances and that such act was negligence and a proximate cause of the injuries sustained by plaintiff.

"(2) That Wright was not operating his truck at a rate of speed in excess of 45 miles per hour just prior to the collision.

"(3) That the act of Wright in operating his truck at a rate of speed in excess of 25 miles per hour just prior to the collision was a proximate cause of the injuries sustained by appellee.

"(4) That just prior to the accident Wright was negligent in failing to keep his truck under proper control and that such negligence was a proximate cause of the injuries sustained by Mrs. Howell.

"(5) That Wright was negligent in failing to keep a lookout for persons on the highway ahead of him just prior to the accident and that such negligence was a proximate cause of the injuries sustained by Mrs. Howell.

"(6) That Wright failed to sound any warning of the approach of the truck as he approached the place of collision and that such failure was negligence and a proximate cause of the injuries sustained by appellee.

"(7) That the failure of Wright to stop the truck just before he did stop it was negligence, and that such negligence was a proximate cause of the injuries sustained by Mrs. Howell.

"(8) That Wright failed to drive the truck and trailer on the concrete portion of the highway at the time of the collision and that such failure was negligence and a proximate cause of the injuries sustained by the appellee.

"(9) That prior to the accident Wright discovered Gracie Howell in a position of peril, but that such discovery was not made within such time and distance as that by the exercise of ordinary care in the use of all the means at his command, he could have avoided the accident.

"(10) That the occurrence made the basis of the suit was not the result of an unavoidable accident.

"(11) That Mrs. Howell did not fail to keep a lookout for vehicles approaching from the south on the highway at the time of the accident.

"(12) That Mrs. Howell did not run suddenly across the highway after hitting Dan Schell in the face with an object.

"(13) That Mrs. Howell did not fail to look to the right before starting to cross the highway.

"(14) That Mrs. Howell did not fail to look to her right before crossing the center line of the highway.

"(15) That Mrs. Howell failed to stop before crossing the center line of the highway but that such failure was not negligence.

"(16) That Mrs. Howell did not run into the side of the truck on the occasion made the basis of the suit.

"(17) That the plaintiff had sustained damages in the sum of $18,500 on account of past and future physical pain, mental suffering and loss of earning capacity.

"(18) That the present cash value of future medical expenses was the sum of $1,500."

The record and the briefs are long, but the contentions of appellants here may be condensed into these four general ones, to-wit:

(1) The arguments of the appellee's counsel to the jury in nine separate indictments were highly improper and prejudicial against the appellants, to the extent that the court reversibly erred in not granting them a new trial upon each one of them;

(2) The trial court erred in refusing to submit to the jury appellants' specially requested issues Nos. 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, and 15, together with two other subsidiary ones thereto attached, to the same effect;

(3) The stated findings of the court and the jury—with special reference to the manner in which it was therein determined the accident herein involved occurred—having been completely refuted by the testimony of many disinterested witnesses, by pictures taken at the scene soon after the accident happened, and by measurements made there then by disinterested officers of the law—were so against the great weight of the evidence as to be clearly wrong;

(4) The jury's finding under issue No. 45, fixing at $18,500 the damages sustained by the injured appellee, for physical pain, mental anguish, and loss of earning capacity, was so excessive as to indicate passion, prejudice, sympathy, or some other improper motive on the jury's part, as, in justice, to have required the setting of such finding aside in its entirety, or the reducing of it by a substantial amount.

Such of these presentments as are directed against the judgment in its entirety will be disposed of first. This court is unable to hold either the jury's verdict, or the trial court's implied additional findings, so against the overwhelming weight and preponderance of the evidence in any respect as to require the exercise of its exclusive authority to reverse it upon that ground; this, for the reason that, in its opinion, there was upon the whole only such a conflict in the testimony having to do with the manner of happening of the accident—inclusive of the several acts of the two participating parties therein—as well as the extent of the appellee's resulting injuries and the amount of her entailed damages, as it was the sole province of the court and jury to resolve.

It is not required that a reiteration, nor even a comprehensive resume, of the extensive body of the evidence be here made, entailing undue length upon this opinion; but it is enough to record this court's finding from a review of the whole body of the evidence, that the court and jury were not unwarranted in finding the accident to have happened substantially in the manner claimed by the appellee, and the precipitated damages therefrom upon Mrs. Claflin to have been the $20,000 awarded her; there were two distinctly clashing theories severally relied upon by the opposing parties upon each of these issues, and it cannot, we think, properly be said, either that the evidence was insufficient to raise issues of fact over them, or to support as facts the findings made thereon. This conclusion seems to this court to be the more justified from the circumstance that the cause was largely what is termed a "fact case". As concerns the actual happening of the accident, this very brief recitation from the appellees' brief is thought to be fully supported in the statement of facts:

"The appellee and her companion, Grace Rayburn, testified that the appellee was struck in the back by appellants' truck when appellee was on the east shoulder of the Airline Road. The defendant Wright, who was driving the truck at the time of the collision, testified that while he was pulling to the east shoulder of the Airline Highway the appellee was struck with the side of his truck. The only other witness who was in the vicinity of the collision at the time it occurred was R. H. Smith, called by the appellants, who was standing down the highway some 150 yards, with the lights of the truck in his eyes, but still

testified that the side of the truck struck the appellee as she crossed the highway. The only other witnesses were those that arrived at the scene of the collision after it had occurred and testified as to marks on the highway and shoulder, and identified the pictures that were taken, and attempted to impeach appellee by prior inconsistent statement attributed to appellee, who was suffering from a broken back, was irrational of mind if not unconscious, whose lower extremities were found to be paralyzed shortly thereafter, together with other serious injuries, and likewise attempted to impeach the testimony of Grace Rayburn on alleged inconsistent statements made while she was holding the appellee's head and hysterical, or nearly so, from fright, as to the condition of her injured companion."

Likewise, this capitulation of what was so further reasonably shown as to her resulting injuries, and her diminished earning capacity during her future life expectancy, is considered to have equal support:

"Appellee was unconscious off and on from the day of the accident until the following Saturday (the accident having occurred on Thursday evening); that when she regained consciousness she was paralyzed from her waist down; that there were other bruises on her body and injuries to her back; that she could not move her legs or toes and that there was a lot of pain in her head, and she had had very bad headaches from the date of the accident on November 10, 1938, down to the date of the trial; that at the time of the trial she weighed 19 pounds less than at the time of the accident; that she was operated on the Saturday following the Thursday on which she was injured, and it required a week or ten days before her legs regained any feeling in them; that it was a week or ten days after the operation before she could move her legs; that they operated on her spine and the scar extends from above her waist up her back as far as they could operate, about a foot or so in length; that she remained in bed at the hospital a few days less than five weeks and was taken home in an ambulance where she remained in bed for about five additional weeks; that she went to the hospital for treatment thereafter; when she started to get out of bed she was so weak she had to learn to walk over again; that she suffered pain at the time of the trial and had since the accident;

that she was operated on the second time on August 2nd at Jefferson Davis Hospital; that they again operated on her spine and she stayed in the hospital three weeks that time and after she went home remained in bed two more weeks; that she had trouble sleeping at the time of the trial and has never felt well since she was injured and is in pain all the time; that she does not eat as well as she did before her injuries; that she tried to work in July and she worked three weeks and could not stand it and fainted at the place where she worked; that at the time of the trial if she walks very much her feet and legs start to get dead and have a numb feeling; that if she tried to walk fast it makes her limp; that at the time of the trial she takes medicine to relieve the pain in her head; that she has had female trouble since her injuries and her periods have not been regular, which affects her nerves and makes her weak; that at the time of the trial she continues to spend three-fourths of her time in bed or sitting around home; that at the time of her injuries she worked as a waitress and had been earning $7 a week and got room and board which would have cost $10 or $15 a week, and received her tips, which ran between $10 and $12 a week. That at the time of her injuries she had a life expectancy of 42 years. Dr. Fred Bloom testified that he first saw appellee at Jefferson Davis Hospital; that she was semi-conscious and paralyzed from the waist down; that she was suffering from a fracture of the spine and an injury to the spinal cord; that due to the paralysis, both of her legs, her bowels and bladder did not function normally; that he waited 48 hours, but there was no evidence of return of function, and it was necessary to operate. The fractured fifth lumbar vertebra was displaced sufficiently to cause a pressure on the spinal cord. Her spine was operated on to relieve this pressure; that this type of injury occurs only in forceful accidents with lots of force behind them; that appellee was operated on the second time in August to clear up an infection in the operative wound; that this operation was done under his direction; that the injury received in the accident caused her female trouble; that at the time of the trial Mrs. Howell was totally disabled from following physical work, that she was totally and permanently disabled from following her occupation, or a similar occupation requiring physical exertion; that at the time of

the trial there is still evidence of irritation to her spinal cord, weakness and atrophy or decrease in the size of the muscles and in her strength; that in his opinion the appellee would require one or two minor operations before the present drainage would stop; that she should have a bone graft in the future and would need care and observation for a year or perhaps two years before the operation could be performed on her back to relieve the pain and give her additional strength, all together, which would require a minimum of two or three years of observation and treatment, and from two to three operations in the future after the date of this trial for the proper treatment of her injuries."

For the reasons last given, the claim of excessiveness in the amount of the judgment must fall, along with that for lack of support for any of its other essentials in the evidence.

Upon a recurrence to appellants' specified objections to the theory upon which the learned trial court submitted the cause to the jury, as reflected in their requested special-issues Nos. 4–15, inclusive, as well as their two subsidiary ones, it is concluded that no reversible error is pointed out in any of them; indeed, that, under the pleadings and evidence, the very comprehensive cross-examination imposed by the trial court on the jury in the 46 special issues it required them to answer, reasonably and fairly submitted all the ultimate issues of fact raised by either party, and that, if there were errors in any of them, they were not of such character as were reasonably calculated to and probably did result in an improper judgment in the cause. It will only be necessary to specifically advert to Nos. 4, 7, 10, and 13, since they propounded the most material issues of fact, the refusal to submit which, appellants claimed, denied them substantial rights. Of these, the findings sought were: Under No. 4, whether the appellee, Mrs. Claflin (or Howell) "failed to discover the approach of the defendants' truck before crossing the center line of the highway"; under No. 7, whether she "failed to give any signal of her intention to cross the highway before running across it"; under No. 10, whether she "crossed the highway on the occasion in question in a careless manner"; under No. 13, whether she "failed to discover the approach of the defendants' truck before starting to cross the highway."

▮ In the first place, as appears supra, the trial court had, in a slightly different form, submitted all that was material and ultimate in these four requests under its given special issues 36, 33, and 27, propounding, respectively, in appellants' interest on the lookout issues, (1) whether she had failed to look to her right before crossing the center line of the highway, (2) whether she had failed to look to the right before starting to cross it, and (3) whether she had failed to keep a lookout for vehicles approaching from the south on the highway at the time of the accident, each and all of which—as the quoted jury-findings show—had been answered adversely to appellants' contentions. The granting of these requests would have therefore, in effect, amounted to a second submission of essentially the same things, which is neither required nor good practice; 41 T.J. 1051; Ft. Worth Corp. v. Bahan, Tex.Civ.App., 68 S.W.2d 228; 64 C.J., page 865 et seq.; Levy v. Rogers, Tex. Civ.App., 75 S.W.2d 304, writ dismissed; D. & H. Truck Line v. Hopson, Tex.Civ.App., 4 S.W.2d 1013, writ refused; Texas Co. v. Betterton, Tex.Civ.App., 56 S.W.2d 663, reversed on other grounds, 126 Tex. 359, 88 S.W.2d 1039.

▮ Furthermore, the two of these requests inquiring as to whether the appellee failed to so discover the approach of appellants' truck that is, numbers 4 and 13, appear to be merely evidentiary in character rather than ultimate, which condemns them anyway; while number 7 assumes what was otherwise shown to be a disputed if not indeed an immaterial matter—that "she ran across the highway, after striking Dan Schell with a cocoanut"—, and number 10 was uselessly too general in merely seeking whether she had crossed the highway "in a careless manner".

The challenged arguments of counsel for the appellee are thus considered at long last, because they cast their shadows backward after the admission of evidence before the jury had been closed by the resting of both sides. They were 8 in number, as hereinafter successively enumerated, six made by one of appellee's counsel in opening their discussions before the jury, the others, Nos. 2 and 4, having been presented by another of her attorneys in closing her case, and were, in his verbis, as follows:

"(1) The sheriff came out there and by that time Wright had some pretty nice theories about how he turned that truck off the highway to prevent that injury. It made me feel ashamed to represent a cripple girl here if you are going to believe that stuff,

but when you break his testimony down it is a different thing. It is a great deal different when you get the component parts on it, you find out some things about it. The deputy sheriff went out there after it happened. When I talked to him about his investigation out there he would not show it to me and asked me which side I was on.

"The Defense:

"There is no testimony like that—he asked you who you represented. There is no testimony in the record and you did not demand them, and you asked him if he made that statement and the deputy denied it.

"The Court:

"You can have your bill.

"Mr. Helm:

"I want to withdraw the first part of that statement, but it is undenied that he asked me who I represented. He said he lost that diagram, and I asked if it was written on a typewriter like other reports and he said no he did not write up those on a typewriter, but that it is one way of presenting evidence before you."

"(2) They told you about the pictures being taken from the front and rear, the only testimony is they were taken from the rear."

"(3) I want you men out there in the jury room to get hold of those questions and answer them and award the verdict you think she is justly entitled to and I mean that if I ever uttered a statement in the court room before that I wanted to get you to follow.

"You have full authority to arrive at that amount and I am going to ask you to consider this crippled girl's future. This is the last time she will pass before you. This is the last opportunity you will have to render a verdict that you will be proud of and that you men can go out of that jury room together and give your final answer and sealing your verdict to be read in the morning, and you can say I have rendered a verdict I am proud of, a verdict based on the credible testimony and we have rendered a verdict for $26,000 plus $1,500 that Dr. Bloom told you was the minimum for the future medical treatment and the treatment he has given her, which in other words total $27,500.

"I want you to protect this girl if you think she is right and is telling the truth. If you think she lied do not give her anything, do not answer a single question for her, but if you think she told you the truth and is deserving and you think she deserves to be taken care of, she has not been helped yet except thrown in a charity hospital, I want you to do the right thing and do not apologize for writing that verdict, and do not say we turned that girl loose on account of secondary testimony that his Honor has told you was only admissible for impeachment purposes, and we will give this girl this money because we think she deserves it and you do not have to apologize."

"(4) I want to thank you for listening most attentively and I know when you go into the jury room you are not coming out until you reach a verdict fair and just and one of which you are proud, and for the plaintiff in the condition she is in and is entitled to."

"(5) You have in this case a situation that is heart rending in one sense of the word, a nice looking girl just reaching womanhood, just reaching a point in life where maybe she is just beginning to enjoy life a little better. She has had some experience, she has not enjoyed a happy life up to the 10th day of November, 1938. She had difficulties, she had not enjoyed those blessings of motherhood and things like that that so many women of her age, she had a tough row of it, she had been knocked around the country and had earned her living in a hard way from early in the morning until late at night as a waitress."

"(6) And they got that student doctor over from Louisiana, I do not think that he has had much experience, and he was so busy telling you about some facts that he smelled something on her breath, this paralyzed girl out there at the point of death, everybody hacking on her, he was so busy doing that he did not find out if they operated on her or anything else."

"(7) And the great humanitarian manner of looking after her, they send a doctor up there to treat her, no, to operate on her, no, to take her out of a charity institution and put her in a hospital where they was to pay the bills, no, they go out there to spy on her, to find out what she will say, if they can get her to say anything, regardless of her conscious or unconscious condition. They are up there gathering evidence at the request of the Peden Iron & Steel Company and what does he report back to the Peden Iron & Steel Company, that the girl was conscious at the time, still apologizing for that accident out there."

"(8) I cannot tell how you are going to answer any of these questions, all I can do is to put my entire faith and confidence in you and that you will render a fair verdict in this case. I want you to ask yourselves those questions, I want each man to ask himself what he would have done if he had been in the Peden Iron & Steel Company—I take that back. I want to ask what any reasonable, careful person would have done out there·in the shoes of the Peden Iron & Steel Company and Wright."

■ Appellants offered no objections to any of these deliverances when made, except to the first part of No. (1), and the whole of No. (2), but did assign all eight as error in their motion for a new trial, which the court overruled, after "having duly considered the motion and the statements and argument of counsel"; the angle, then, from which they must be reviewed upon appeal is thus outlined by the Supreme Court in Robbins v. Wynne, 44 S.W.2d 946, at page 949, col. 1:

"The correct rule is that, if the argument be such, or is made under such circumstances that, if objection is made at the time counsel making the argument can offer explanation therefor which will render such argument proper, or can make such amends as will render the same undoubtedly harmless, or, if the argument be of such a nature that its proper withdrawal by counsel or instructions by the court to the jury to disregard will cure the error, and render its harmful effect free from doubt, then the objections should be made at the time, and failure to do so waives the error. On the other hand, if the argument be such that the converse of the above propositions is true, then it would be idle to say that opposing counsel should object at the time, when the objection might do nothing more than render the improper remarks more damaging than they would be if he remained silent."

So that, this court's task as to these arguments is to determine: (1) whether or not the proceedings that followed upon the objections to the first two cured any prejudicial error entailed by their having been made, or rendered the removal of any harmful effect therefrom free of doubt; (2), whether or not any or all of the remaining six are of such a nature that, if objection had been made to them at the time, any like error and harm resulting therefrom might have been thereby cured and removed.

As to No. (1) it will be noted that the objection interposed was to counsel's statement that the deputy sheriff, when accosted by him just before this trial about his investigation of this accident, "would not show it (his typewritten statement of his investigation) to me, and asked me which side I was on"; on being challenged by the objection, counsel withdrew that statement, and then added the second part of No. (1), as quoted supra, to which appellants made no objection; wherefore counsel's revised statement was, "it is undenied he asked me who I represented, he said he lost that diagram, and I asked him if it was written on a typewriter like other reports and he said no he did not write up those on a typewriter"; the officer's admitted testimony on these details otherwise was that he had had a set of typewritten records on this accident at that time, and that when so asked by appellee's counsel if he had lost them, he replied he did not then have them with him; further, that the measurements were not then on the typewritten records; he added that after such pre-trial conversation with counsel, he went and got such records and put the measurements on them before testifying. At all events, it undisputedly appeared that, perhaps about an hour afterwards, he did in fact testify fully in court on this trial about them and from them, giving the jury the benefit of his version of the scene, how the accident appeared to him to have happened, the skid-marks he found on the ground, et cetera.

■ It seems to this court that this withdrawal and correction by appellee's counsel in the attending circumstances clearly removed any potentially harmful effect from his argument as first made, and reduced it to no more than a practically immaterial misquotation of the testimony, or a mere squabble over whether the officer's given reason for not producing his records was that "he didn't have them with him", or that he "had lost them", any possibly erroneous effect of which was waived by the appellants by their failure to further object. Ramirez v. Acker, 134 Tex. 647, 138 S.W.2d 1054; Texas Co. v. Gibson, 131 Tex. 598, 116 S.W.2d 686; Texas Employers', etc. v. Peppers, Tex.Civ.App., 133 S.W.2d 165, writ dismissed, judgment correct; Robbins v. Wynne, Tex.Com.App., 44 S.W.2d 946, supra; Stewart v. Coats, Tex.Civ.App., 91 S.W.2d 421; Geistmann v. Schkade, Tex.Civ.App., 121 S.W.2d 494.

Indeed, if objection had been then made to the only remaining mis-statement of even the officer's testimony—that he said he had lost the diagram—either counsel or the court certainly could, and presumably would, have corrected it to read exactly as the officer put it, that he answered he "did not have them with him". 41 Tex. Jur. 771; Oil Belt Co. v. Touchstone, Tex. Civ.App., 266 S.W. 432; Federal Surety Co. v. Smith, Tex.Civ.App., 25 S.W.2d 994, reversed by Commission of Appeals on other grounds, 41 S.W.2d 210.

■ Likewise, challenged comment No. (2)—when reduced to its ultimate purport in the actual proceedings had—plainly appears to this court to have been another mere misquotation of the testimony, rather than any volunteering by appellee's counsel of new testimony before the jury, in that, in therein saying "they told you about the pictures being taken from the front and rear", he should have, to be exact, said, "they told you about the pictures taken from the right side and the other side"; for that was the exact statement of the appellant Wright, to whose testimony as a witness on the trial this criticised statement had reference. Mr. Wright, while so testifying, first identified one of the photographs of the scene appellants offered in evidence, which had been taken from the rear of its truck on the shoulder of the highway; after testifying that the picture had been so taken from the rear, when asked by appellee's counsel where the person taking that picture was standing, he answered:

"He was standing on the right hand side of the highway, and he went on the other side and taken one."

Upon objection being interposed by appellants on the ground that the argument was not supported by the record, counsel for appellee at once withdrew the statement, and the court instructed the jury to disregard it.

It is held that no reversible error remained; authorities last cited supra, and Texas Fireworks Co. v. Gunn, Tex.Civ. App., 189 S.W. 528, writ refused; Hubb Diggs Co. v. Bell, 116 Tex. 427, 293 S.W. 808; First States Life Co. v. Mote, Tex. Civ.App., 110 S.W.2d 591.

When comments (3) to (8), inclusive, are looked at from the appellate perspective, it is concluded that all of them "are of such a nature that, if objection had been made to them at the time, any like error and harm resulting therefrom might have been thereby cured and removed."

■ In the first place, under the authorities already cited, it is considered that these presentments—all being of a waivable character—were each waived by the appellants' stated failure to object to them when made, and their deliberately choosing to take their chances on a favorable verdict from the jury notwithstanding each and all of them.

■ In the second place, when they are intrinsically examined seriatim, there seems to be nothing inflammatory nor beyond the permissible scope of inferences and deductions counsel may make in presenting a cause to the jury on such evidence as was heard in this instance; there evidently was more than needful zeal and admonition to men of ordinary intelligence in these presentments to this jury, but when that is eliminated, there appears to have been nothing left of a prejudicial and harmful effect that could properly be held to have persisted—to the injury of the appellants—through their deliberate failure on the trial to give the court and opposing counsel an opportunity to cure and correct anything untoward in character—according to appellants' view—that was then occurring.

■ For instance, under comments Nos. (3) and (4), it was not beyond the bounds of such propriety for appellee's counsel to ask the jury for the full $27,500 damages they sued for and offered evidence to substantiate; nor to ask a verdict commensurate with the appellee's injuries and resulting condition, as being just in the circumstances under which the accident occurred; especially so, when counsel did not therein in any way essay to inform the jury as to the legal effect of their answers; indeed, they had a right to thus ask for nothing but a verdict on the evidence, and one that was fair and just, according to their appraisal of the testimony, in her behalf upon the entire case. Such an appeal was not in substantial substance improper, under such authorities as these: Gillette Motor Transport v. Blair, Tex.Civ.App., 136 S.W.2d 656, writ dismissed, correct judgment; International & G. N. R. Co. v. Jones, Tex.Civ.App., 175 S.W. 488, writ refused.

■ Comment No. (5) likewise appears to embody more fulsomeness than was called for, but still, as preceding recita-

tions from the record have indicated, it was a summing-up of evidence that was actually before the jury, together with counsel's rather elaborate deductions therefrom, and even these do not appear to have been outside of the record, inflammatory in character, or so violative of any rights in appellants as should be held to have survived through their failure to make any objections whatever thereto during the trial. Neither, as indicated, did they assume as facts matters that had not been testified to before the jury, hence these extended comments of counsel on the evidence in the case cannot now be held to have been outside the bounds of legitimate advocacy; Corn v. Crosby Co., Tex.Com.App., 25 S. W.2d 290.

■ Argument No. (6), as summarized in the appellee's brief, which does not appear to be inaccurate, was made without objection from appellants in these circumstances: "The record shows that Dr. Tannehill was an interne at Jefferson Davis Hospital at the time of the collision in question and was on duty in the emergency room when the appellee, Mrs. Howell, was brought there, and that he examined her and admitted her to the hospital, and in examining her stuck her legs with a pin and discovered that she had no sensation and admitted her to the hospital with a possible fractured vertebra, and further testified as to conversation with her and as to every odor on her breath, but did not know what treatment was given her, nor what the ultimate diagnosis of her injuries was, nor did he know if she was even ultimately operated on, and other evidence showed that her legs were stuck with pins and that numerous examinations were made."

Here, too, it is thought the mere use of the word "hacking", which did not appear in the testimony of any of the witnesses, instead of some word of like or similar character, which was used by some of the witnesses, such as "sticking", "examining", "operating", or "testing her vital processes", should not be held such an appeal to the jury's passions or prejudices on matters not in evidence as to entail a reversal in appellants' favor, despite their having made no complaint thereof during the trial; on the contrary, in the circumstances shown, it is thought to be classable, as only another misquotation of specific language used by the witnesses as might have been eliminated entirely, had objection thereto been made.

■ Likewise, succeeding comment No. (7) is quite similar, in general purport at least, to No. (6), it having been made, as stated by the appellees, in these attending circumstances: "The record shows that Dr. Feagin was sent to Jefferson Davis Hospital early the next morning following the accident in question to see the appellee, Mrs. Howell, but not to treat her, and was to report back to the defendant, Peden Iron & Steel Company, and the record further showed that Dr. Feagin did talk to the appellee, Mrs. Howell, and stated that she was conscious, but the appellee, Mrs. Howell, testified that she had never seen Dr. Feagin in her life and did not remember any such conversation, and if she talked to him, she was unconscious at the time."

There was testimony from both Dr. Feagin and Mrs. Howell (now Claflin) justifying this quoted summary from the appellee; that is, while counsel's language was strong, he was justified in commenting that the mission of the doctor was carried out "regardless of her conscious or unconscious condition", that he did not go there to treat her, nor to take her to some other hospital, and that he had not seen her since that visit until in the courtroom at this trial; finally, that he had been sent there by the appellant Steel Company, with no disclosed mission.

Undoubtedly, it is thought, more euphonious language might have been used to express such reasonable and fair deductions as counsel in his advocacy was entitled to draw from these statements of the witnesses, and presumably they would have been substituted, or some other correction made, had appellants challenged them on the trial; but not having done so, it is concluded that the appellee should not be penalized by such overzealousness of her counsel, upon statements of the two witnesses involved that were so bluntly and directly contradictory. Levy v. Rogers, Tex.Civ.App., 75 S.W.2d 304, writ dismissed; Corn v. Crosby County, etc., Tex. Com.App., 25 S.W.2d 290; City of Waco v. Killen, Tex.Civ.App., 59 S.W.2d 940, writ dismissed; First States Life Co. v. Mote, Tex.Civ.App., 110 S.W.2d 591; Wright Titus, Inc. v. Swafford, Tex.Civ. App., 133 S.W.2d 287, writ dismissed, judgment correct; Ramirez v. Acker, 134 Tex. 647, 138 S.W.2d 1054.

■ The (8th) and last comment, as therein qualified by the counsel himself

who made it, appears to this court to have been well within his province in the circumstances; as the record shows, this comment was not upon testimony dealing with the damage issues involved, but was directed by appellee's counsel to the alleged failure of appellants to take and introduce in evidence more photographs of the scene of the accident than they had done; wherefore, arguments having to do with appeals by counsel to the jury to place themselves in the injured party's shoes in assessing damages, are inapplicable. Without further discussion of the objection, it is held not well taken, for the reasons variously indicated in holdings like these: A. B. C. Storage v. Herron, Tex.Civ.App., 138 S.W. 2d 211, writ dismissed, judgment correct; Texas & N. O. R. R. Co. v. McGinnis, 130 Tex. 338, 109 S.W.2d 160; Smith v. Surtees, Tex.Civ.App., 143 S.W.2d 90; Wells v. Henderson, Tex.Civ.App., 78 S.W.2d 683.

The conclusions stated require an affirmance of the trial court's judgment; it will be so ordered.

Affirmed.

### On Motion for Rehearing.

This cause has been given painstaking consideration on a rehearing, upon written arguments from both sides, that for the appellees having been invited by this court in reply to those ably urged by the appellants. After such a full review, the court is constrained to adhere to its former disposition, after correcting an error in recital appearing in its original opinion, to which appellants' counsel have helpfully called attention.

In the concluding paragraph on page 11 of that opinion, this language is found:

"As to No. (1), it will be noted that the objection interposed was to counsel's statement that the deputy sheriff, when accosted by him just before this trial about his investigation of this accident, 'would not show it (his typewritten statement of his investigation) to me, and asked me which side I was on.'"

That recitation should have been as follows:

"As to No. (1), it will be noted that the objection interposed was to counsel's statement that the deputy sheriff, when accosted by him just before this trial about his investigation of the accident, 'would not show it (his original penciled statement of his investigation) to me, and asked me which side I was on.'"

That same inaccuracy recurs in the last line of such page 11, as follows:

"The officer's admitted testimony on these details otherwise was that he had a set of typewritten records on this accident at that time, and that when so asked by appellee's counsel if he had lost them, he replied he did not then have them with him."

When corrected, it reads this way:

"The officer's admitted testimony on these details otherwise was that he had had a set of original penciled records on this accident at that time, and that when so asked by appellees' counsel if he had lost them, he replied that he did not have them with him."

This court is unable to give such important meaning to this corrected statement as appellants so earnestly do; they appear to consider it as going to the heart of the whole controversy, whereas to this court it seems to be no more than a slight inaccuracy, which still does not undermine the conclusion formerly announced upon that particular one of the challenged arguments of appellees' counsel; as there recited, this officer, in the circumstances formerly set out, did in fact go before a jury with his "original penciled statement" of the investigation he had made on the ground of the accident, and was permitted to give his full testimony back and forth on all phases of it. It is, therefore, a non sequitur, it is thought, to contend, as appellants still do, that such small departure of counsel in his zeal for his client, as to have said the officer would not show him his "typewritten" statement of his investigation, instead of saying he would not show him his "original penciled" statement, changed the effect of that argument from a mere misquotation of the evidence to a prejudicial effort to then testify himself before the jury.

The inaccuracies in other respects contended for by the appellants are not considered to be well taken.

Under the belief that the original decision was correct, the motion will be overruled.

Overruled.